MILKOVICH v. INDUSTRIAL COMMISSION et al.

No. 5811.   Decided February 11, 1937.   (64 P. [2d] 1290.)

*Irvine, Skeen & Thurman,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *A. R. Barnes,* of Salt Lake City, for defendants.

WOLFE, Justice.

Certiorari to the Industrial Commission which denied an award to applicant on the ground that she had not sustained the burden of proof that she was partially dependent on her

son Joso. He was fatally injured in the course of his employment with the Standard Coal Company on November 3, 1932. The Standard Coal Company employed more than three men and is a self-insurer. Joe's average weekly wage was, at the time of his death, $19.67 per week.

Testimony was entirely by depositions, except for affidavits by the deponents which were earlier filed. The applicant, Joe's mother, living at the village of Smiljan Yugoslavia, wrote a racy and appealing letter received by the commission on January 16, 1933, in which she requested the commission to send her compensation. When we say she wrote a letter, we mean one was evidently written at her behest for her deposition later taken revealed she affixed a cross as her signature. On November 17, 1933, more than one year after Joe's death, another letter of the same nature as the first, with applicant's name affixed, was received by the commission. The Royal Yugoslav Consul General, through his attorneys in Portland, Ore., interested himself in the case and later the said attorneys had local representation by an attorney before the commission, but this was not until after the year after the death had elapsed. This local attorney must be considered as representing the applicant. He caused the Industrial Commission to issue its commission to the judge of the Royal District Court at Gospic, Yugoslavia, to take depositions, and four depositions on submitted interrogatories and cross-interrogatories were taken and properly returned. Outside of the affidavits earlier made by the same four witnesses, which evidently were not stricken but remained in the case, they constitute the only evidence. The affidavits, being in narrative form, vitalize the depositions and contain nothing in contradiction.

The defendant objected to the consideration of the case on the ground that no application had been filed within the year. The commission rightly held that the letter from the applicant received January 16, 1933, was sufficient application to toll the statute. It takes not much to legally awaken

the commission to the fact that a person is applying for compensation. An informal letter is sufficient.

Passing this point, the only remaining question is: Was there sufficient evidence of partial dependency of the mother to permit us to say as a matter of law that proof of partial dependency was sustained?

Summation of the evidence contained in the depositions and given virility by the affidavits is as follows: Manda, the mother, seventy-six years of age, had twelve children, of whom five were then living. Joso (Joe) was the oldest child. In order to help support the large family, he went to America in 1901 to seek livelihood there. Her husband, Mate Milkovich, died in 1911. The husband's earnings were very small, so Joe sent them regularly "all his earnings that were left over from his personal needs." When her husband died, her need became all the greater, so Joe tried even more to support her and his younger brothers. She received different sums, twenty, fifty, and more dollars at a time several times a year, except years of the war, by means of people returning from America to the native country and by letter. It amounted on an average of $150 a year from the time of departure until his death. She lived with her son Luka, who also has four minor children, on the property of the village known as family community or "zadruga," but she could not live on that. Seldom did he send money by check "because our people are not used to remitting money by checks" (this by the affidavit). The affidavit states also that the $150 represents only an approximate average of what he sent her as the yearly contribution depended on his earnings. "When his earnings were better he used to send more than given average, and when they were poorer, naturally I would receive less."

Further, by affidavit but not by deposition, she states that during the last few years before his death, Joe sent her in July, 1930, by Mikola Pezelj, $50, which converted was 2,600 dinars. By Ivan Bunjcevic, the sum of $65 in 1931, delivered to her through her son-in-law Ivan Novacic. In January,

1932, she received in letters $30. The sum of $150 a year, "considering the high rate of exchange on dollar currency, is a considerable amount for our conditions here." She has two daughters and they are both married.

Ivan Novacic, her son-in-law, states through deposition, further amplified in detail by the earlier affidavit, that in 1931 he received from Joe a check in a letter for Manda in the sum of $30; also in the same year from Ivan Bunjcevic of Podlapac the sum of $65 for his mother, which he sent to her. Marija Uzelac, not related, by deposition testifies that in 1921, when she traveled from America, the deceased son sent $140 to his mother through her. And before she left, while he boarded with her (affidavit), he sent by letters, thirty, fifty, or more dollars. Her affidavit, or ex parte statement, goes into more detail. She kept his money in an envelope with the money of other boarders in a trunk and Joe came and asked her to open the trunk and give him money to send to his mother. And he would "often mention to me his mother and brother Luka, and when he had drank a little more wine he would cry for his mother. When my husband and I returned home from America and before we left for the old country, Joso asked me to take some money to his mother and that from this money I deposit 10,000 dinars in savings bank and deliver to her the bank book so she could draw sums as she needed them, and the balance I should deliver to her in cash which was $140.00 and I followed his instructions accordingly."

Mikola Pezelj, a farmer residing at Smiljan, testified by deposition that Joe gave him at Racine, Wis., $50 for delivery to his mother in the year 1930. He exchanged this into 2,600 dinars at Zagreb and delivered the same to Manda Milkovich. His affidavit is the same but fuller and more narrative and informal.

All these affidavits and depositions are uncontradicted and from the little unsolicited details, such as the names of

places where money was exchanged, and the simplicity of their narration, they have to us the stamp of ■ truth. But we are not the judges. The commission is the judge. In *Norris* v. *Industrial Comm.*, 90 Utah 256, 61 P. (2d) 413, 415, we said:

"The Legislature has, in effect, said: 'The Commission is the final arbiter of the facts. If there is error in judgment or conclusions of or from facts, it must be the Commission's error and remain there. We give the Supreme Court the right to speak only by warrant of law in compensation cases when it speaks in reference to errors of law alleged to have been made by the Commission.' "

In that case we also laid down the following conditions which would at least have to pertain in the case of uncontradicted testimony before we would say the ■ commission had acted arbitrarily in coming to a conclusion different from that which the uncontradicted evidence would seem to dictate, to wit:

"But in order to reverse the commission in this regard it must appear at least that (a) the evidence is uncontradicted, and (b) there is nothing in the record which is intrinsically discrediting to the uncontradicted testimony and (c) that the uncontradicted evidence is not wholly that of interested witnesses or, if the uncontradicted evidence is wholly or partly from others than interested witnesses, that the record shows no bias or prejudice on the part of such other witnesses, and (d) the uncontradicted evidence is such as to carry a measure of conviction to the reasonable mind and sustain the burden of proof, and (e) precludes any other explanation or hypothesis as being more or equally as reasonable, and (f) there is nothing in the record which would indicate that the presence of the witnesses gave the commission such an advantage over the court in aid to its conclusions that the conclusions should for that reason not be disturbed."

Certainly, the reverse would ordinarily be true, that is, if the commission came to a conclusion opposite to that seemingly dictated by the uncontradicted testimony and (b) there was nothing in the record which was intrinsically discrediting to the uncontradicted testimony and (c) that testimony was corroborated by disinterested parties in regard to whom

the record showed no bias and (d) the evidence was such as to carry conviction and sustain the burden of proof and (e) it precluded any other hypothesis as being more or equally as reasonable and (f) there was nothing in the record which would indicate that the presence of witnesses gave the commission such an advantage over this court in aid to its conclusion, we would then, unless there were some other features not herein mentioned which would give the conclusions of the commission credence, hold that the commission as a matter of law had acted arbitrarily and unreasonably.

The instant case is ideal to test out the rule. Certainly, all testimony being by deposition, condition (f) is present, i. e., there is nothing in the record which gave the commission an advantage over us in arriving at a conclusion. The evidence is uncontradicted. Condition (b) is in applicant's favor for there is nothing in the record, as in the cases of *Kavalinakis* v. *Industrial Comm.*, 67 Utah 174, 246 P. 698, and *Ntamanakis* v. *Industrial Comm.*, 67 Utah 197, 246 P. 706 which was intrinsically discrediting. Condition (c) is met. There are disinterested corroborating witnesses, so we have not the case of *Kourgentakis* v. *Industrial Comm.*, 67 Utah 194, 246 P. 705, and there is nothing in the record to show that these corroborating witnesses were telling untruths or were biased in favor of the applicant. Furthermore, the evidence precludes any other hypothesis as being more or equally reasonable. Certainly, a boy gone to America to help his family, unmarried and working, would be most likely to spare periodic sums for his miserably poor mother and his needy brothers and sisters. This hypothesis is more in keeping with the situation than the opposite.

Does the evidence carry a reasonable measure of conviction and does it sustain the burden of proof? Here again, if there is any doubt raised by the evidence or the record, that doubt must be resolved in favor of the commission's conclusions. And this court, where reasonable men could differ as to whether the evidence carried conviction or sustained the burden of proof, would not

disturb the commission's decision. But we do not think that any person could reasonably say that the uncontradicted evidence in this case did not go so far as to sustain the burden of proof, nor that it was not convincing. That being so, and being uncontradicted, this condition was met.

That means that the applicant met all the tests which applied to the evidence under the rule in the Norris Case which would warrant this court to find as a matter of law that the commission should have arrived at a different conclusion from this uncontradicted evidence.

It is further contended that the evidence, if believed by the commission, does not make out a case of partial dependency in law; that it only shows the son sent gifts to his mother, brothers, and sisters, from time to time. Call these contributions what we may, they were furnished to aid in support and to a person who in law could and would expect support from a son working when she was in dire poverty. In 28 R. C. L. 770, § 65, it is said:

"In construing the statute, as applied to particular cases, the word 'dependent' should not be given its narrowest nor its most literal meaning, when considered in connection with the act in question, its aims and objects. As a very general proposition, it may be said that a dependent is one who looked to or relied on the decedent for support and maintenance. Reliance must have been placed upon the deceased employee to provide the applicant for compensation, in some measure or to some extent, with his or her future living expenses. And where this is the case, it is not material that the contributions were made at irregular intervals, or in differing amounts nor that the money was paid in accordance with the provisions of a contract. The purpose of the statute is to provide the workman's dependent in future with something in substitution for what has been lost by the workman's death, and, consequently, to establish dependency the applicant for compensation must show that he or she had reasonable grounds to anticipate future support from the decedent. This reasonable expectation of continuing or future support or maintenance seems to be the true criterion as to who are dependents."

It is said there is no evidence of contributions within the last year before decedent's death and that some of the evi-

dence goes back to 1921. In cases like this, where the alleged giver is dead and the recipient old, it is not to be expected that specific evidence of each contribution will be available. It is only required to show a situation where it may be reasonably inferred that the contributions continued instead of being terminated. Evidence of contributions in 1921 and prior years, together wiith evidence of contributions in 1930 and 1931, together with evidence on the part of the mother that they continued since the boy came to America until his death, are sufficient to meet the legal requirements of establishing a partial dependency. The mother's estimate of $150 a year as an average was in a sense a conclusion, but by its nature it could not be broken down into lesser elements without a more excellent memory or the aid of memoranda.

We realize that there is danger that a racket may be created for making proof of dependency in case of foreign relatives of deceased employee's in America. But if that develops, there are ways to uncover it and if it reasonably appears to be the case, it may well be that this court would hold that the record did not carry conviction or sustain the burden of proof. On the other hand, a requirement by the commission that a foreign applicant must, in order to recover, produce money order receipts or documentary evidence in corroboration is, in itself, an evidence of arbitrariness, because worthy applicants, not schooled in such matters and unmindful of a tragedy to a son, will ordinarily not think to save such letters, and if the money has been sent by currency through the persons of others, as in this case, may in fact not have any official receipts. Because of this fact, a worthy applicant should not fail. The commission cannot compel certain sorts of evidence, but must take the cases as they are presented with such evidence as the nature of the case permits, and from such evidence come to its conclusion, rather than from the fact that a certain type of evidence, presentation of which it makes a condition precedent, has not been forthcoming.

The order of the commission denying an award is set aside with instructions to grant a rehearing. If no further evidence is produced, the commission must as a matter of law grant the applicant an award. Costs to the applicant.

FOLLAND, C. J., and EPHRAIM HANSON, MOFFAT, and LARSON, JJ., concur.